**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 1:26-23911**

TELEVISAUNIVISION, INC. and TELEVISA, S.
de R.L. de C.V.,

    *Plaintiffs*,

v.

LUIS FERMÍN GIL ALPHAND; EDGAR
CRISTIAN OLVERA SALAZAR;
INNDOMANAGEMENT S.A.P.I. de C.V.; ENZU
LLC; JUAN ANTONIO LÓPEZ GARCÍA; JOSE
LUIS GUADARRAMA TORRES; ALBERTO
GARCÍA LEAL; DASH NETWORKS INC.;
DIGITALOCEAN, LLC; HOSTGATOR.COM
LLC; and, JOHN DOES 1-20,

    *Defendants*.

_____/

**VERIFIED COMPLAINT FOR COPYRIGHT AND**
**TRADEMARK INFRINGEMENT, AND EMERGENCY**
**INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL**

Plaintiffs TelevisaUnivision, Inc. and Televisa, S. de R.L. de C.V. (collectively, "Plaintiffs" or "TU"), by and through their undersigned counsel, file this Verified Complaint for Copyright Infringement, Trademark Infringement, and Application for Temporary Restraining Order against Defendants Luis Fermín Gil Alphand, Edgar Cristian Olvera Salazar, INNDOMANAGEMENT S.A.P.I. de C.V., Juan Antonio López García, Jose Luis Guadarrama Torres, Alberto García Leal, Enzu LLC, Dash Networks Inc., DigitalOcean, LLC, HostGator.com LLC, and John Does 1-20 (collectively, "Defendants"), and allege as follows:

**NATURE OF THE CASE**

1.    This is an emergency action for willful copyright and trademark infringement, circumvention of technological protection measures, and related claims arising from Defendants'

1

operation of a sophisticated network of pirate streaming services that systematically steal, reproduce, and commercially exploit Plaintiffs' valuable copyrighted content and federally registered trademarks.

2.      Plaintiffs seek emergency injunctive relief, including a temporary restraining order and preliminary injunction, to halt the ongoing and irreparable harm to Plaintiffs' intellectual property rights. Emergency relief is imperative because Plaintiffs hold exclusive broadcast rights for the FIFA World Cup 2026 and 2030 in sixteen Latin American territories, and Defendants have publicly announced their intention to illegally capture and retransmit those broadcasts to subscribers in the United States — in direct violation of Plaintiffs' copyrights and in breach of Plaintiffs' contractual obligations to FIFA. The World Cup commences on June 11, 2026, and every day of delay compounds the irreparable harm. As detailed herein, TelevisaUnivision, Inc. is headquartered in Florida, at least one Defendant maintains its principal place of business in Florida, and Defendants' pirated streams are actively marketed to, accessed by, and paid for by Florida residents.

3.      TU is the world's leading Spanish-language media company, producing and distributing premium content to audiences across the globe. TU operates two broadcast networks (Univision and UniMás), nine U.S. cable networks — including TUDN, the #1 Spanish-language sports network in the United States — and local television stations across the country. TU's flagship digital platform, ViX, is a major over-the-top (OTT) Spanish-language streaming service that combines a free ad-supported (AVOD) tier with a premium subscription (SVOD) tier in a single application. The free tier offers over 100 live channels and tens of thousands of hours of on-demand content, while the premium tier provides exclusive original programming, reduced or ad-free viewing, and additional premium sports and film content. ViX's content library encompasses

telenovelas, series, films, live sports — including Liga MX soccer, the most popular professional soccer league in Mexico and the most-watched soccer league in the United States — as well as news and documentaries. The platform is available at vix.com and through applications on iOS, Android, Roku, Fire TV, Apple TV, Samsung TV, and other connected devices.

4.      As of 2024, ViX has surpassed 50 million global monthly active users and more than 7 million paid premium subscribers, making it the largest dedicated Spanish-language streaming service in the world. ViX's primary markets are the United States — where it serves the nation's approximately 65 million Hispanic residents — and Hispanic America, including Mexico and most Spanish-speaking Latin American countries. ViX is headquartered in Miami, Florida, where TelevisaUnivision maintains its principal U.S. offices, and employs over 200 personnel dedicated to content, technology, and operations. The platform has more than 100,000 subscribers in Florida and enjoys broad availability and strong engagement among Hispanic communities, particularly in the Miami-Dade County area, where it generates both subscription revenue from SVOD users and advertising revenue from AVOD viewers.

5.      Defendants operate, control, host, and/or facilitate the operation of a network of unauthorized Internet Protocol Television ("IPTV") services — including Thunder TV, Sunset TV, Pop TV, Kaelus TV, and Tele Latino (collectively, the "Infringing IPTV Service(s)") — that illegally reproduce, distribute, publicly perform, and display Plaintiffs' copyrighted works and trademarks without authorization. The Infringing IPTV Services offer users access to live and on-demand streams of Plaintiffs' programming — including premium ViX content, Liga MX soccer broadcasts, TUDN live programming — generating revenue through subscription fees while paying nothing to Plaintiffs. Defendants' conduct gives rise to two independent but related bases for the relief sought herein.

3

6. As to the <u>first</u>, Defendants have directly and willfully infringed TU's copyrights and trademarks by reproducing, publicly performing, and distributing TU's proprietary content through the Infringing IPTV Services without any authorization from Plaintiffs. These claims for copyright and trademark infringement stand on their own, independent of any FIFA-related issues described below, and entitle Plaintiffs to the full range of remedies available under the Copyright Act and the Lanham Act.

7. As to the <u>second</u>, and with extraordinary urgency in light of the imminent commencement of the FIFA World Cup 26™, TU holds exclusive media rights to transmit the FIFA World Cup 26™ and FIFA World Cup 30™ (together, the "World Cup") in Mexico under a License and Services Agreement with FIFA (the "FIFA Media Rights Agreement"). Under that Agreement, TU bears a contractual obligation to actively prevent its FIFA content from being accessible outside this territory, including in the United States, where the World Cup media rights have been separately granted by FIFA to third parties. Upon information and belief, the Infringing IPTV Services intend to capture TU's licensed broadcast signal from Mexico and retransmit it to subscribers in the United States, thereby placing TU in breach of its FIFA obligations and exposing TU to catastrophic contractual consequences — including mandatory remedial action, termination of the Agreement, forfeiture of hundreds of millions of dollars in consideration already paid, and permanent loss of the World Cup media rights. The Infringing IPTV Services are already actively advertising that they will transmit World Cup programming to their subscribers.

8. The Infringing IPTV Services are not passive or incidental operations. They are sophisticated, well-funded criminal enterprises that operate for profit. Defendants charge subscribers between $15 and $54 per month for access to pirated content, process payments in both U.S. dollars and Mexican pesos through identifiable bank accounts and payment processors,

recruit networks of resellers to expand their subscriber base, and deliver their unauthorized streams through U.S.-based server infrastructure. The commercial scale and organizational complexity of Defendants' operations demonstrate that this is not casual file-sharing but an orchestrated piracy scheme targeting Plaintiffs' most valuable content.

9.      This emergency action is necessary because Plaintiffs have exhausted all available non-judicial remedies. Plaintiffs have sent hundreds of DMCA takedown notices to hosting providers, domain registrars, and CDN services, as well as formal demand letters to app distribution platforms — including Roku, Inc. — demanding immediate removal of the Infringing IPTV Services. Defendants have ignored these notices and, in many cases, responded by migrating their operations to new servers, registering additional domains, and expanding their subscriber base. The scale, sophistication, and resilience of Defendants' infrastructure is such that it cannot be effectively dismantled without judicial intervention. Only a TRO disabling Defendants' U.S.-based streaming servers and associated domain infrastructure can halt the ongoing infringement before the World Cup commences.

## THE PARTIES

10.      Plaintiff TelevisaUnivision, Inc. is a Delaware corporation with its principal place of business at 8551 NW 30th Terrace, Doral, Florida 33122, in Miami-Dade County. TelevisaUnivision, Inc. is the leading Spanish-language media company in the United States, operating the Univision and UniMás broadcast television networks, numerous cable networks, and the ViX streaming platform.

11.      Plaintiff Televisa, S. de R.L. de C.V. is a Mexican limited liability company with its principal place of business in Mexico City, Mexico. Televisa is one of the largest producers of Spanish-language content in the world and owns or controls copyrights in thousands of audiovisual

works, including the works at issue in this action. As will be explained in detail below, through New IP Co, LLC ("NIP"), an affiliate entity within TU's corporate group, Plaintiffs hold exclusive media rights under a License and Services Agreement with FIFA to transmit the FIFA World Cup 2026 and 2030 in Mexico. Those rights impose stringent contractual obligations on TU to prevent its licensed FIFA content from being accessible outside of the designated territory.

12.     Defendant HostGator.com LLC ("HostGator") is, on information and belief, a limited liability company organized under the laws of Florida with its principal place of business in Jacksonville, Florida. HostGator provides web hosting services. Upon information and belief, HostGator hosts Thunder TV domains mxthundertv.com and thundertv.mx at IP addresses 192.185.131.134 and 192.169.250.114, through which Thunder TV maintains commercial storefronts used to advertise, market, and sell subscriptions to the pirate IPTV service. On information and belief, despite the .mx top-level domain extensions, the administrative, technical, and billing management of these domains is centralized at HostGator's facilities in Jacksonville, Florida.

13.     Defendant Luis Fermín Gil Alphand ("Gil Alphand") is, on information and belief, an individual residing in Mexico who owns, operates, and controls the Infringing IPTV Service named "Thunder TV." On information and belief, Thunder TV's subscription payments flow directly to his personal BBVA bank account (CLABE 012180015605213962), as verified through a Comprobante Electrónico de Pago ("CEP") issued by Banxico bearing his full legal name and Mexican Tax Identification Number (RFC: GIAL700614PH3). Gil Alphand maintains a professional connection to Altán Redes, S.A.P.I. de C.V., a telecommunications company incorporated in Mexico, and the same telecommunications carrier operating the Thunder TV sales WhatsApp line (+52 56 6002 9486).

14. Defendant Edgar Cristian Olvera Salazar ("Olvera Salazar") is, on information and belief, an individual residing in Mexico who owns, operates, and controls the Infringing IPTV Service Thunder TV jointly with Gil Alphand. Olvera Salazar participates in the management and technical operations of the Infringing IPTV Services. On information and belief, Olvera Salazar is the founding shareholder of INNDOMANAGEMENT S.A.P.I. de C.V., a holding company with a broad corporate purpose covering technology development and administration of multiple businesses.

15. Defendant INNDOMANAGEMENT S.A.P.I. de C.V. ("INNDOMANAGEMENT") is, on information and belief, a Mexican corporation that serves as the corporate vehicle through which Gil Alphand and Olvera Salazar operate the Infringing IPTV Services, including receiving payments (Mercado Pago account; CURP: OESE870910HPLLLD04) and managing domain registrations.

16. Defendant Juan Antonio López García ("López García") is, on information and belief, an individual residing in Lázaro Cárdenas, Michoacán, Mexico, who developed, operates, and controls the Infringing IPTV Service named "Sunset TV." López García is identified as the developer of the Sunset TV application (com.desoft.sunsettvapp) distributed through the Google Play Store under "Desoft" namespace. His developer profile also lists the application "Flix TV" (com.desoft.flixtv), and the Mercado Pago payment account associated with Sunset TV was registered under the brand name "Flix TV," confirming that López García operates both services through the same development and payment infrastructure.

17. Defendant Jose Luis Guadarrama Torres ("Guadarrama Torres") is, on information and belief, an individual residing in the State of Morelos, Mexico, who serves as a financial beneficiary of the Infringing IPTV Service Sunset TV. On information and belief, Guadarrama

Torres receives subscription payments generated by Sunset TV through SPEI and Spin by OXXO payment channels. His CURP registration ties him to Morelos, matching the area code of the WhatsApp sales line used to distribute Sunset TV subscriptions.

18. Defendant Alberto García Leal ("García Leal") is, on information and belief, an individual residing in the State of Hidalgo, Mexico (RFC: GALA941129EY3), who owns, operates, and controls the Infringing IPTV Service named "Tele Latino." On information and belief, García Leal is the primary financial beneficiary of Tele Latino, receiving subscription payments through his BBVA Bancomer account (CLABE 012313015864564724). His email address is also associated with "Oleada TV," and investigative communications have confirmed that Oleada TV and Tele Latino are operated by the same enterprise. García Leal is a cloud services specialist whose technical expertise correlates with the multi-cloud infrastructure deployed by both services.

19. Defendant Enzu LLC ("Enzu") is, on information and belief, a limited liability company organized under the laws of Wyoming with its principal place of business in Cheyenne, Wyoming. It maintains a data center in Miami at 50 NE 9th Street. Enzu provides cloud and colocation hosting services. Enzu hosts the live television streaming server at IP address 199.188.74.13 and the video-on-demand ("VOD") server at IP address 5.180.41.47 through which Thunder TV delivers pirated TU content — including live TUDN broadcasts and ViX-exclusive series — to subscribers.

20. Defendant Dash Networks Inc. ("Dash Networks") is, on information and belief, a corporation organized under the laws of Wyoming with its principal place of business in Cheyenne, Wyoming. Dash Networks operates the streaming infrastructure under Enzu at the same IP

8

addresses identified above. Dash Networks maintains data centers in Miami at 50 NE 9th Street and 36 NE 2nd Street, Suite 520.

21.     Defendant DigitalOcean, LLC ("DigitalOcean") is, on information and belief, a limited liability company organized under the laws of the State of Delaware with its principal place of business in New York, New York and Broomfield, Colorado. DigitalOcean provides cloud hosting infrastructure services used by Defendants to operate certain of the Infringing IPTV Services. DigitalOcean hosts all seven servers in Pop TV's infrastructure, including the C2 primary server at IP address 138.197.235.3 (Santa Clara, California), the C2 backup server at IP address 159.65.188.24 (Clifton, New Jersey), the main IPTV gateway at IP address 134.209.211.89 (North Bergen, New Jersey), and fallback nodes at IP addresses 142.93.3.196, 157.230.82.61, and 138.197.224.59 (all in North Bergen, New Jersey), through which Pop TV delivers pirated TU content to subscribers. On information and belief, DigitalOcean hosts servers in TELE LATINO's infrastructure, including at IP address 165.227.192.153. On information and belief, DigitalOcean hosts servers in SUNSET TV's infrastructure. On information and belief, employees of DigitalOcean reside in Florida.

22.     Defendants John Does 1–20 are individuals and/or entities whose true names are presently unknown to Plaintiffs despite diligent investigation. On information and belief, the John Doe Defendants own, operate, or facilitate the operation of the infringing platforms Pop TV and Kaelus TV as discussed below or otherwise participated in, facilitated, or contributed to the infringing acts alleged herein. In addition, Plaintiffs will amend this Complaint to identify the John Doe Defendants when their identities are ascertained through discovery or other means. On information and belief, the Infringing IPTV Services known as Sunset TV, Pop TV, Tele Latino, and Kaelus TV are owned, operated, and/or controlled by one or more of the John Doe Defendants.

9

Investigation has not yet identified publicly available corporate registrations or named officers for any of these services. Their operators deliberately conceal their identities through privacy-shielded domain registrations, anonymous payment channels, and decentralized reseller networks. Plaintiffs seek expedited discovery to identify the individuals and entities responsible for these services.

**JURISDICTION AND VENUE**

23.     This Court has original subject matter jurisdiction over Plaintiffs' federal copyright claims pursuant to 28 U.S.C. §§ 1331 and 1338(a), and 17 U.S.C. § 501. This Court has original jurisdiction over Plaintiffs' Lanham Act claims pursuant to 28 U.S.C. §§ 1331 and 1338(a), and 15 U.S.C. § 1121. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

24.     This Court has general personal jurisdiction over Defendant HostGator because HostGator is a limited liability company organized under the laws of Florida with its principal place of business in Jacksonville, Florida. HostGator is therefore "at home" in Florida and subject to suit here on any claim.

25.     This Court has specific personal jurisdiction over the remaining Defendants because they have purposefully directed their infringing activities toward the United States and specifically toward Florida, have transacted business within Florida, and the claims in this action arise directly from Defendants' Florida-directed contacts.

26.     Specifically, upon information and belief: (a) Thunder TV maintains a listed business address at 80 Harrison Lane, Fort Walton Beach, FL 32547, as publicly displayed on its website (https://thundertv.shop/); (b) Defendants Enzu and Dash Networks maintain physical data centers in Miami, Florida — Enzu at 50 NE 9th Street, and Dash Networks at 50 NE 9th Street and 36 NE 2nd Street, Suite 520 — from which they host the streaming infrastructure used to

deliver pirated content to subscribers; (c) upon information and belief, the founders of DigitalOcean, Ben and Moisey Uretsky, reside in Miami, Florida, and the company has employees within the state; (d) Defendants actively solicit Florida residents through targeted online advertising; (e) Defendants accept subscription payments in U.S. dollars from Florida residents; (f) Defendants' infringing streams are accessed daily by users located in Florida; and (g) on June 3, 2026, an individual located in Miami, Florida was able to access the Kaelus TV and Sunset TV services from Miami using a Fire TV Stick purchased locally, downloaded and installed the infringing applications through sideloading, and was able to view TelevisaUnivision content, including live television channels and ViX programming. These contacts establish that Defendants have purposefully availed themselves of the privilege of conducting activities in Florida, such that they should reasonably anticipate being haled into court here.



27.     The Court also has personal jurisdiction over Defendants under Florida's long-arm statute, Fla. Stat. § 48.193(1)(a)(1), because Defendants regularly transact business in Florida. Upon information and belief, Defendants accept subscription payments from Florida residents in exchange for access to pirated content, have established ongoing commercial relationships with Florida consumers, and derive substantial revenue from those relationships.

28.     In addition, the Court has personal jurisdiction under Fla. Stat. § 48.193(1)(a)(2) because Defendants have committed tortious acts within Florida. Defendants' unauthorized reproduction and distribution of Plaintiffs' copyrighted content reaches Florida consumers, and Defendants' use of Plaintiffs' trademarks to market pirated content causes consumer confusion in Florida. These tortious acts cause direct injury to Plaintiffs, who maintain their principal U.S. place of business in Miami-Dade County.

11

29.     The exercise of personal jurisdiction over Defendants comports with constitutional due process requirements. Defendants have purposefully availed themselves of the privilege of conducting activities in Florida by: (a) maintaining physical infrastructure in Miami; (b) actively soliciting Florida residents; (c) accepting payment from Florida consumers; and (d) directing their infringing activities toward Florida. Defendants should reasonably anticipate being haled into court here. The exercise of jurisdiction comports with traditional notions of fair play and substantial justice given Plaintiffs' strong interest in obtaining relief in this forum, Florida's interest in adjudicating disputes involving businesses operating within its borders, and the efficiency of resolving all claims in a single proceeding.

30.     Alternatively, this Court has personal jurisdiction over the foreign Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2) because: (a) this action arises under federal law; (b) Defendants are not subject to personal jurisdiction in the courts of general jurisdiction of any state; and (c) exercising jurisdiction is consistent with the Constitution and laws of the United States. Defendants have purposefully directed their unauthorized distribution of copyrighted and trademark-protected content to a United States audience, their streams are accessed by users throughout the United States, and they accept payment in U.S. dollars through U.S.-based payment processors.

31.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including Defendants' hosting of infringing content on servers located in Miami and their solicitation of Florida residents. Venue is also proper under 28 U.S.C. § 1391(b)(1) because Defendant HostGator resides in this District and under 28 U.S.C. § 1400(a) because Defendant HostGator may be found in this District. Additionally, venue is proper under 28 U.S.C. § 1391(c)(3) because the Mexico-based Defendants are not residents of the United States and may therefore be sued in any judicial district.

**FACTUAL ALLEGATIONS**

### A. Plaintiffs' Copyrighted Works

32.     Plaintiffs[1] own exclusive copyrights to a vast library of original Spanish-language audiovisual programming, including popular telenovelas, dramatic series, reality programs, news broadcasts, and entertainment specials. These works represent billions of dollars in creative investment and are among the most popular Spanish-language programs worldwide. Plaintiffs' copyrighted works include, but are not limited to, the following representative works (collectively, the "TU Copyrighted Works") that have been registered with the United States Copyright Office:

| Title | Copyright Holder | Registration Number |
|---|---|---|
| Chespirito (Episodes 1–44) | Televisa, S.A. | PA 818-310 |
| Chespirito (Episodes 45–95) | Televisa, S.A. | PA 818-311 |
| Chespirito (Episodes 96–141) | Televisa, S.A. | PA 818-312 |
| El Chapulín Colorado (Episodes 1–40) | Televisa, S.A. | PA 818-341 |
| El Chapulín Colorado (Episodes 41–66) | Televisa, S.A. | PA 818-342 |
| La Carabina de Ambrioso (Episodes 1–10) | Televisa, S.A. | PA 828-348 |
| La Carabina de Ambrioso (Episodes 11–57) | Televisa, S.A. | PA 828-349 |
| La Carabina de Ambrioso (Episodes 58–109) | Televisa, S.A. | PA 828-350 |
| La Carabina de Ambrioso (Episodes 110–161) | Televisa, S.A. | PA 828-351 |
| La Carabina de Ambrioso (Episodes 162–208) | Televisa, S.A. | PA 828-352 |
| El Derecho de Nacer II (Episodes 1–44) | Televisa, S.A. | PA 818-237 |
| El Derecho de Nacer II (Episodes 45–190) | Televisa, S.A. | PA 818-238 |
| Macario | Televisa, S.A. de C.V. | PA 1-013-161 |

---

[1] Over the years, Televisa has changed its corporate form — from Televisa, S.A., to Televisa, S.A. de C.V., to its present form, Televisa, S. de R.L. de C.V. — but the copyrights have stayed within the same corporate group throughout.

33.     In addition to the foregoing registered works, Defendants reproduce and publicly perform through their various IPTV platforms numerous additional copyrighted works owned by Plaintiffs, including but not limited to the telenovelas *Abrázame Muy Fuerte* (2001), *Al Diablo con los Guapos* (2007), *Clase 406* (2002), *La Madrastra* (2005), *Rebelde* (2004), and *Vecinos* (2018), as well as premium ViX-exclusive content, TUDN live sports broadcasts, Liga MX match programming, and planned FIFA World Cup content.

### B.     Plaintiffs' Trademarks

34.     Plaintiffs own either in their own name or in the name of affiliated entities within the corporate group (such as TelevisaUnivision Interactive, LP., ViX Content C.V., and Univision Communications Inc.) valid and subsisting trademark registrations on the Principal Register of the United States Patent and Trademark Office. The following is a representative, non-exhaustive list of Plaintiffs' trademark registrations (collectively, the "TU Marks"):

| Mark | Reg. No. | Reg. Date | Classes | Owner |
|------|----------|-----------|---------|-------|
| VIX (word mark) | 5,280,151 | Sept. 5, 2017 | 35, 41 | TELEVISAUNIVISION INTERACTIVE, LP |
| ViX | 7,787,623 | May 6, 2025 | 9, 38, 41 | TELEVISAUNIVISION INTERACTIVE, LP |
| TELEVISA (word mark) | 4,439,069 | Nov. 26, 2013 | 9 | VIX CONTENT C.V. |
| TELEVISA (word mark) | 2,408,822 | Nov. 28, 2000 | 38 | VIX CONTENT C.V. |
| TELEVISA (word mark) | 2,680,215 | Jan. 28, 2003 | 38 | VIX CONTENT C.V. |
| Televisa | 2,692,233 | Mar. 4, 2003 | 35, 38, 41 | VIX CONTENT C.V. |
| | 1,078,093 | Nov. 22, 1977 | 38 | VIX CONTENT C.V. |

14

| | 2,685,696 | Feb. 11, 2003 | 38 | VIX CONTENT C.V. |
|---|---|---|---|---|
| | 2,726,440 | Jun. 17, 2003 | 35, 41, 42 | VIX CONTENT C.V |
| | 5,532,629 | Aug. 7, 2018 | 9, 35, 38, 41 | VIX CONTENT C.V |
| TELEVISAUNIVISION (word mark) | 8,161,547 | Mar. 3, 2026 | 9, 35, 38, 41 | UNIVISION COMMUNICATIONS INC. |
| Televisa Univision | 8,161,548 | Mar. 3, 2026 | 9, 35, 38, 41 | UNIVISION COMMUNICATIONS INC. |

35.     The TU Marks are famous and distinctive, and are recognized by the relevant consuming public as identifying Plaintiffs as the source of high-quality Spanish-language media, entertainment, and streaming services. Plaintiffs have expended substantial time, money, and other resources developing, advertising, and promoting the TU Marks. The TU Marks are symbols of Plaintiffs' quality, reputation, and goodwill.

36.     Defendants, without Plaintiffs' authorization, use the TU Marks in connection with the Infringing IPTV Services, including by:

a.  Displaying and/or promoting "ViX," "TUDN," "Televisa," "Univision," and other TU-branded channel names and logos within the Thunder TV, Sunset TV, Pop TV, Tele Latino, and Kaelus TV applications and on their associated websites and social media pages;

b.  Advertising the availability of TU's branded channels and platforms (including "ViX Premium," "TUDN," and "Las Estrellas") to attract and retain paying subscribers; and

15

    c.   Creating the false impression that the Infringing IPTV Services are affiliated with, sponsored by, or authorized by Plaintiffs.

37.    On information and belief, Defendants have full knowledge of Plaintiffs' ownership of the TU Marks and the TU Copyrighted Works at all times relevant hereto, including Plaintiffs' exclusive rights to use, perform, distribute, and license such intellectual property and the goodwill associated therewith. Defendants knowingly and willfully trade and capitalize on Plaintiffs' reputation and goodwill and the commercial value of the TU Marks.

### C.    Defendants' Infringing Activities: *The Infringing IPTV Services*

38.    On information and belief, Defendants own, operate, control, host, and/or facilitate the operation of one or more unlicensed streaming websites and services that illegally offer Plaintiffs' copyrighted programming to users in the United States. The Infringing IPTV Services provide users with access to live streams of Plaintiffs' television channels and on-demand access to Plaintiffs' copyrighted works.

39.    The Infringing IPTV Services reproduce, distribute, publicly perform, and publicly display Plaintiffs' copyrighted works without authorization. The Infringing IPTV Services also use Plaintiffs' trademarks—including the TELEVISA, UNIVISION, TELEVISAUNIVISION, and VIX marks and program-specific marks—to identify and promote the availability of Plaintiffs' content without authorization. Defendants generate revenue from the Infringing IPTV Services, including through paid subscriptions, advertising, and other monetization methods.

40.    Defendants' infringing activities are willful and deliberate. Defendants have received actual notice that their activities infringe Plaintiffs' rights through: (a) DMCA takedown notices sent by Plaintiffs or their agents to hosting providers, domain registrars, and app stores; (b) formal cease-and-desist letters demanding that Defendants immediately cease their infringing conduct; and (c) removal of certain infringing content by third-party platforms in response to

Plaintiffs' complaints. Despite this actual knowledge of infringement, Defendants have not only continued but actively expanded their infringing operations — adding new domains, recruiting additional resellers, and openly advertising their intent to pirate the upcoming World Cup broadcasts.

41. Defendants' infringement has caused and continues to cause Plaintiffs substantial and irreparable harm, including: (a) loss of exclusive control over the distribution of Plaintiffs' copyrighted works; (b) dilution and tarnishment of Plaintiffs' famous trademarks; (c) lost subscription revenue from consumers who access pirated content instead of paying for legitimate services; (d) lost advertising revenue from reduced viewership on legitimate platforms; (e) harm to Plaintiffs' relationships with content licensors, advertisers, and distribution partners; and (f) damage to Plaintiffs' reputation and goodwill. As detailed below, Defendants' conduct also threatens catastrophic contractual consequences under Plaintiffs' FIFA Media Rights Agreement.

### C.1 Thunder TV

42. Thunder TV is an unauthorized commercial IPTV service that markets itself online as a premium entertainment platform. The service is made available to the public through a sprawling network of at least 118 domains ("IPTVs Domains") – registered across multiple registrars (principally NameCheap, PublicDomainRegistry, and IONOS SE) and hosted on servers in the United States. Through these websites and affiliated social media channels, Thunder TV advertises access to "20,000+ Live TV Channels and 80,000+ Movies & Series (VOD) with premium quality streaming," including TU Copyrighted Works, and offers subscription packages priced in both Mexican pesos and U.S. dollars ($15–$54 USD per month), explicitly targeting both Mexican and U.S.-based consumers.





Thunder TV – Official 4K IPTV Streaming Service

43.     Thunder TV's marketing materials prominently display the logos and brand names of Plaintiffs' channels and platforms, including TUDN, ViX, and Las Estrellas, to attract subscribers. The service maintains public Facebook groups, and conducts direct sales through

18

WhatsApp, presenting itself as a legitimate alternative to authorized streaming services while operating entirely without authorization from any content owner.



https://thundertvdealer.com/

44.     Thunder TV operates through a deliberately decentralized, three-layer architecture designed to ensure business continuity in the event of partial enforcement action. On information and belief, Thunder TV distributes a custom Android application (th.apk / thundertv2.0.apk) outside of official app stores via sideloading. On June 3, 2026, the Thunder TV application was downloaded and installed on a Fire TV Stick located in Miami, Florida using the AFTVNews Downloader application with download code 480310, demonstrating that the application remains actively distributed and accessible to U.S. consumers.

> a.  **Layer 1 — Distribution and Sales** The application is a repackaged version of a generic IPTV client ("VSA Client") that has been modified to carry the Thunder TV branding and hardcoded to connect to a specific command-and-control ("C&C") server at the domain reliable.rayote.com or another Thunder TV domain.

This C&C server manages the subscriber database, validates paid accounts, and controls user access.

b. **Layer 2 — CDN and Domain Masking (Cloudflare)**. The C&C server's true IP address is concealed behind Cloudflare's global CDN network, which acts as a reverse proxy. A standard lookup of rayote.com returns only Cloudflare's IP addresses (172.64.0.0/13 range), not the real origin server. The domain rayote.com is registered through IONOS SE, with DNS managed by Namecheap/NameSilo. The registrant contact is located in Jalisco, Mexico, suggesting a distributed operation.

c. **Layer 3 — Content Delivery (U.S.-Based)**: Once authenticated, the application pulls live TV and on-demand video content from streaming servers located in the United States — specifically servers operated by Defendants Enzu LLC and Dash Networks Inc. at IP addresses 199.188.74.13 (Live TV, e.g., TUDN), 5.180.41.47 (VOD, e.g., VIX series), and Cloudflare, Inc. at IP address 172.67.148.36 (Subtitles/Metadata).

45.     Thunder TV also actively recruits new resellers/distributors, thereby exponentially expanding the scope of the infringement by creating a multi-level distribution network of independent sellers, each of whom onboards additional subscribers to the pirated content.

46.     This decentralized architecture is intentionally designed so that if the video servers are taken down, the subscriber database on the C&C server survives, and vice versa. Effective enforcement therefore requires simultaneous action against all layers.

47.     On information and belief, Defendant Gil Alphand and Defendant Olvera Salazar are the principals behind INNDOMANAGEMENT and are responsible for creating, operating,

and managing the Infringing IPTV Service Thunder TV. They control the selection of content, the technical infrastructure, the marketing, and the revenue generated by the Infringing IPTV Services.

48.     On information and belief, Defendants Enzu, Dash Networks, DigitalOcean, and HostGator provide the hosting, server infrastructure, and/or content delivery services that are essential to the operation of the Infringing IPTV Services. These Defendants have received notices of infringement from Plaintiffs or their agents but have failed to take adequate action to terminate or disable the Infringing IPTV Services, thereby enabling and facilitating the ongoing infringement.

### C.2     Sunset TV

49.     Sunset TV is an unauthorized IPTV and SVOD service that presents itself to the public as a polished, full-service streaming platform comparable to legitimate services. Like Thunder TV, Sunset TV is made available through multiple domains, and distributes its application through both the Google Play Store and sideloading. On June 3, 2026, an individual in Miami, Florida was able to download and install the Sunset TV application on a Fire TV Stick using the AFTVNews Downloader application with download code 18479, and using login credentials obtained through the service's distribution network, was able to access live TelevisaUnivision channels. The Sunset TV application included a dedicated channel grouping for "Live Soccer Miercoles" with channels specifically designated for the 2026 World Cup, confirming Defendants' intent to pirate and distribute the upcoming World Cup broadcasts.

50.     Sunset TV explicitly targets the U.S. market. Its primary English-language website, sunset-tv.com advertises "unlimited movies, TV shows, and more" and promotes itself as "your go-to destination for hit movies, top TV shows, live sports, and more" with subscription plans

starting at $6.99 per month in U.S. dollars, offers "premium sports channels — NCAA, NBA,

NHL, NFL, and more":



    (a)      Sunset TV advertises and provides access to Plaintiffs' copyrighted content,

including TUDN, Liga MX, and FIFA World Cup programming:





51.      Sunset TV operates a hierarchical reseller/distributor panel model through which third-party distributors purchase credits in bulk (minimum 35 credits per month) and resell subscriptions to end users at a minimum price of $250 MXN per subscriber. This multi-level distribution structure is designed to maximize market penetration while delegating the risk of direct customer contact to downstream resellers.

23



Sunset Tv - Panel Dealer

52.     On information and belief, Defendant DigitalOcean provides hosting, server infrastructure, and/or content delivery services that are essential to the operation of SUNSET TV at least related to the domain https://sunset-tv.site/. Defendant DigitalOcean has received notices of infringement from Plaintiffs or their agents but has failed to take adequate action to terminate or disable the Infringing IPTV Services.

### C.3     POP TV

53.     Pop TV operates a pirate IPTV service that delivers TU Copyrighted Works content to users through a malware-based application targeting Fire TV and Android TV devices. Pop TV's distribution method compromises consumer device security while simultaneously infringing Plaintiffs' copyrights — demonstrating Defendants' complete disregard for both intellectual property rights and consumer protection.

24





54.     Unlike the other Infringing IPTV Services, Pop TV employs a sophisticated two-phase malware infection scheme that is exceptional even among pirate IPTV services. This malware-based distribution model not only facilitates copyright infringement but also poses

significant cybersecurity risks to consumers, further demonstrating the unlawful and harmful nature of Defendants' operations.

55. In the first phase, users are induced to install a trojanized application called "PopUpdater" (PopU.apk), distributed via the AFTVnews Downloader application using short code 793895. The PopUpdater application disables the device's security settings and grants itself administrative access. In the second phase, the PopUpdater silently downloads and installs a hidden IPTV player ("PopNewVersion.apk") that streams pirated content from backend servers.

56. All of Pop TV's backend servers are hosted by DigitalOcean, LLC in the United States. Reverse engineering identified seven servers, all with IP addresses hardcoded directly into the application's source code:

    a.     boral.app — IP 138.197.235.3, U.S.;

    b.     pop-live.app — IP 159.65.188.24, U.S.;

    c.     access.pop-app.live — IP 134.209.211.89, U.S.;

    d.     Fallback Node 1: IP 134.209.211.89, U.S.;

    e.     Fallback Node 2: IP 142.93.3.196, U.S.;

    f.     Fallback Node 3: IP 157.230.82.61, U.S.;

    g.     pop-app.live — IP 138.197.224.59, U.S..

57. The application is built with automatic failover capability — if one server goes down, the application automatically rotates to the next available node. This means all seven IP addresses must be disabled simultaneously, or the service reconnects to a surviving node.

58. Pop TV's operators have implemented advanced evasion mechanisms including: (i) dynamic DNS rotation across multiple fallback servers; (ii) hybrid encryption (AES/Rijndael) of all communications with backend servers to prevent network auditors from detecting the transfer

of channel lists or pirated content; and (iii) deliberate overriding of SSL certificate validation. These measures constitute intentional circumvention of technological protection measures.

59. The operators of Pop TV have not been publicly identified. All domains are registered through GoDaddy and NameCheap with privacy shields concealing the true registrants. Plaintiffs seek expedited discovery, including § 512(h) subpoenas to DigitalOcean, GoDaddy, and NameCheap, to identify the operators.

60. On information and belief, Defendant DigitalOcean provides hosting, server infrastructure, and/or content delivery services that are essential to the operation of the Infringing IPTV Services. Defendant DigitalOcean has received notices of infringement from Plaintiffs or their agents but has failed to take adequate action to terminate or disable the Infringing IPTV Services.

### C.4 TELE LATINO

61. Tele Latino, also referred to as "Tele Latino MAX" is among the largest of the Infringing IPTV Services in scale and reach. Investigation has determined that it functions as a white-label customization layer of a broader piracy network linked to the platforms "Brasil TV," "Magis TV," and "Oleada TV" — a single backend infrastructure supporting multiple commercial piracy brands under an Infrastructure-as-a-Service (IaaS) model.

62. Tele Latino offers over 1,200 live TV channels and more than 550,000 hours of video-on-demand content, including TU Copyrighted Works content and a dedicated section for United States channels featuring NBA, NFL, NHL programming.



https://telelatinotv.com.mx/



https://telelatinopro.com/

63.     Tele Latino distributes its application (telelatino-mob.apk) via sideloading through the "Downloader" app (short code 5317131). The binary incorporates cryptographic obfuscators and hidden libraries (s.h.e.l.l.A) designed to evade detection by antivirus engines and copyright scanners on legitimate platforms.

64.     On information and belief, its backend operates under a hybrid multi-cloud model, with C2 servers and catalog databases distributed between more than one entity, including Google Cloud Platform (GCP), for fault tolerance. On information and belief, the domains are associated with Cloudflare for CDN/masking.

65.     The operators of Tele Latino have not been publicly identified. All domains use privacy-shielded registrations, and Plaintiffs seek discovery to determine their identity.

66.     On information and belief, Defendant DigitalOcean provides hosting, server infrastructure, and/or content delivery services at IP address 165.227.192.153 that are essential to the operation of TELE LATINO at least related to the domain https://telelatino.net/. Defendant

29

DigitalOcean has received notices of infringement from Plaintiffs or their agents but has failed to take adequate action to terminate or disable the Infringing IPTV Services.

### C.5   KAELUS TV

67.   Kaelus TV (also referred to as "Kaelus TV Plus" or "NIBI TV") is an unauthorized IPTV service that streams Plaintiffs' copyrighted content without authorization. Investigation has revealed that "Kaelus" in the IPTV context is not associated with any legitimate corporate entity but rather operates as a brand alias or reseller label within the same piracy ecosystem as Thunder TV and Sunset TV. On June 3, 2026, an individual in Miami, Florida was able to download and install the Kaelus TV Plus application on a Fire TV Stick using the AFTVNews Downloader application with download code 9361960, and using login credentials obtained through the service's distribution network, was able to access live TelevisaUnivision channels and ViX programming. The Kaelus TV application included a dedicated section of channels for "Copa Mundial FIFA 2026," confirming Defendants' intent to pirate and distribute the upcoming World Cup broadcasts.

68.   Kaelus TV appears within Sunset TV's reseller-panel keyword cloud alongside other IPTV brands including Thunder TV, evidencing that it is one of many rebranded storefront labels distributed through the same underlying reseller infrastructure and shared streaming backend.

69.   Like the other Infringing IPTV Services, Kaelus TV advertises and delivers access to Plaintiffs' copyrighted content, including ViX-exclusive programming, TUDN live sports, Liga MX broadcasts, and premium telenovela and series content. The operators of Kaelus TV have not been publicly identified, and Plaintiffs seek discovery to determine their identity and the full scope of the Kaelus TV operation.





https://kaelustv.plus

### D.  Plaintiffs' Need for Emergency Relief

70.  Defendants' ongoing infringement requires emergency injunctive relief. Every day that the Infringing IPTV Services continue to operate, Plaintiffs suffer irreparable harm that cannot be adequately remedied by monetary damages alone. This irreparable harm includes: (a) the

31

continued uncontrolled dissemination of Plaintiffs' copyrighted works to unauthorized users; (b) the continued unauthorized use of Plaintiffs' trademarks to market pirated content; (c) the erosion of Plaintiffs' exclusive rights and the commercial value of those rights; (d) the undermining of Plaintiffs' relationships with legitimate licensees, including FIFA; and (e) the loss of consumer goodwill that cannot be recovered through a damages award.

71.     Absent immediate injunctive relief, Defendants will continue and expand their infringing conduct, causing irreparable harm to Plaintiffs' intellectual property rights, business relationships, and goodwill. Monetary damages alone cannot compensate Plaintiffs for the ongoing erosion of their exclusive rights, the damage to their brand reputation, or the potential breach of their FIFA Media Rights Agreement. The balance of hardships tips decidedly in Plaintiffs' favor: Plaintiffs stand to lose hundreds of millions of dollars in media rights and suffer permanent damage to their relationships with FIFA and other content partners, while Defendants have no legitimate interest in continuing their illegal piracy operation.

72.     Plaintiffs are likely to succeed on the merits of their claims. Plaintiffs own valid copyrights in the TU Copyrighted Works and valid trademark registrations in the TU Marks. Defendants have reproduced, publicly performed, and distributed Plaintiffs' copyrighted works without authorization, and have used Plaintiffs' trademarks to market pirated content. Defendants have received actual notice of their infringement and have continued their infringing activities in willful disregard of Plaintiffs' rights. The evidence of infringement is overwhelming.

**73.**     The public interest strongly favors the issuance of injunctive relief. The public has a significant interest in the enforcement of intellectual property rights and the protection of legitimate content creators from piracy. Injunctive relief would protect consumers from deceptive practices, reduce the distribution of malware through pirate streaming applications, and support

the legitimate media ecosystem that produces the Spanish-language content that millions of viewers enjoy. Denying relief would embolden piracy operations and undermine the investments that content creators make in producing high-quality programming.

**The FIFA World Cup Emergency**

74.     In March 2013, Mountrigi Management Group Ltd ("MMG") secured from FIFA an exclusive license covering certain media rights for the FIFA World Cup 2026 and the FIFA World Cup 2030 under a Licence and Services Agreement (the "FIFA Media Rights Agreement" or "Agreement"). The licence covers sixteen Latin American territories: Argentina, Bolivia, Chile, Colombia, Costa Rica, Ecuador, El Salvador, Guatemala, Honduras, Mexico, Nicaragua, Panama, Paraguay, Peru, Uruguay, and Venezuela (the "Territories"). In September 2022, the Agreement was transferred, with FIFA's consent, to New IP Co, LLC ("NIP"), an entity affiliated with TU and based in New York. By virtue of that transfer, NIP stepped into MMG's position and now controls the media rights across all sixteen Territories. NIP has in turn granted Plaintiff Televisa a sublicence to exploit certain of those rights for Mexico; every sublicensee remains fully subject to the obligations set out in the Agreement. Importantly, the United States falls outside TU's licensed Territories — FIFA has granted the U.S. World Cup media rights to other third parties. TU is therefore contractually required to prevent its signal from reaching U.S. audiences, where a separate licensee's exclusivity would be compromised.

75.     The FIFA Media Rights Agreement places TU under rigorous anti-piracy duties. TU must use every commercially available technical safeguard, so that its World Cup transmissions, and any retransmissions of that coverage, are incapable of being viewed beyond the Territories. Those duties apply regardless of whether a given retransmission was authorized by TU, and they require encryption robust enough to block any out-of-territory reception. FIFA

33

measures compliance against a demanding benchmark: TU must exhaust all available protections and meet FIFA's own satisfaction threshold. The Infringing IPTV Services directly jeopardize TU's ability to meet these requirements by intercepting TU's broadcast signal directed at Mexican viewers and relaying it to and, as a result, U.S.-based subscribers, thereby making TU's FIFA content available in a market reserved for another licensee(s). The pertinent contractual provisions include:

i)    prohibits the Licensee from exercising, authorizing, or permitting the exercise of any Media Rights (or any part thereof) outside of the Territories.

ii)    requires the deployment of digital rights management technologies and solutions to FIFA's satisfaction for the purpose of preventing any unauthorized distributions of transmissions.

iii)    requires that, to the fullest extent possible and to FIFA's satisfaction, all means commercially available at the relevant time — including geo-blocking, digital rights management, content protection devices, and access control technologies — be employed to ensure that transmissions and retransmissions are not capable of reception or viewing outside of the Territories.

iv)    requires the Licensee to ensure that all retransmissions — whether or not authorized by the Licensee — of its cable and terrestrial transmissions of audiovisual coverage are securely encrypted so as to prevent such retransmissions from being received or viewed anywhere outside of the Territories.

34

76. If TU fails to block unauthorized retransmissions, the FIFA Media Rights Agreement exposes it to severe contractual remedies. FIFA may terminate the Agreement on an expedited basis whenever the licensee fails to perform any material obligation and does not cure within the applicable cure period. During a live tournament, that cure window is extremely narrow, meaning termination can follow almost immediately upon a breach. Should FIFA exercise its termination right, all media rights automatically revert to FIFA, the hundreds of millions of dollars TU has already paid are forfeited without recourse, and all outstanding payments continue to fall due. Moreover, a breach triggered by unauthorized retransmissions during the World Cup cannot be undone retroactively — the damage to the contractual relationship, the invasion of the U.S. licensee's exclusive territory, and the resulting commercial injury would already have occurred. No subsequent monetary remedy could restore TU's position under the Agreement.

77. The FIFA World Cup 26 is scheduled to commence on June 11, 2026. The Infringing IPTV Services have already demonstrated the capability to retransmit TU's premium sports content, including Liga MX and TUDN broadcasts. Upon information and belief, these services plan to retransmit World Cup content. This intent is confirmed by: (i) investigative communications in which Thunder TV and Sunset TV operators explicitly confirmed via WhatsApp that their services carry restricted signals including "Liga MX" and "ViX premium"; (ii) active advertising by several of the Infringing IPTV Services promoting access to upcoming FIFA World Cup broadcasts and displaying FIFA World Cup branding on their websites and marketing materials; and (iii) on June 3, 2026, the Kaelus TV and Sunset TV applications, when accessed from Miami, Florida, both displayed dedicated channel groupings specifically designated for "Copa Mundial FIFA 2026" and "2026 World Cup" programming, demonstrating that Defendants have already configured their services to deliver pirated World Cup broadcasts the

moment transmission begins. The imminent commencement of the World Cup makes this threat not speculative but certain — absent judicial intervention, these services will retransmit TU's World Cup signal to U.S.-based subscribers within a matter of days.

78.     TU has taken all commercially available technical measures to prevent unauthorized access, including encryption, geo-blocking, digital rights management, DMCA takedown notices, and formal notices to hosting providers and domain registrars. However, the scale of the infringing infrastructure operating in the United States is such that technical measures alone are insufficient. Judicial intervention through a TRO is the only means to disable the U.S.-based servers before the World Cup commences and to prevent the irreparable harm that would flow from a breach of the FIFA Media Rights Agreement.

79.     Confidentiality restrictions in the FIFA Media Rights Agreement preclude its public filing. Plaintiffs are prepared to make the Agreement available to the Court for *in camera* review upon request.

## CLAIMS FOR RELIEF

### COUNT I
### Copyright Infringement (17 U.S.C. § 501)
### (Against All Defendants)

80.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

81.     Plaintiffs are the owners of valid copyrights in the works identified above and hundreds of additional audiovisual works.

82.     Defendants, without authorization or license from Plaintiffs, have reproduced, distributed, publicly performed, and/or publicly displayed Plaintiffs' copyrighted works through the Infringing IPTV Services, in violation of Plaintiffs' exclusive rights under 17 U.S.C. § 106.

83.     Defendants' infringement is willful, intentional, and in reckless disregard of Plaintiffs' rights. Defendants have actual knowledge that the content they reproduce, distribute, and publicly perform is owned by Plaintiffs, that Plaintiffs have not authorized Defendants' use, and that Defendants' conduct constitutes copyright infringement. Despite this knowledge, Defendants have chosen to continue and expand their infringing activities for commercial gain.

84.     As a direct and proximate result of Defendants' infringement, Plaintiffs have suffered and continue to suffer substantial damages, including lost profits, lost licensing revenue, and irreparable harm to their goodwill.

85.     Plaintiffs are entitled to recover their actual damages and Defendants' profits attributable to the infringement, or, in the alternative, statutory damages of up to $150,000 per work willfully infringed, pursuant to 17 U.S.C. § 504.

86.     Plaintiffs are further entitled to preliminary and permanent injunctive relief, costs of suit, and reasonable attorneys' fees pursuant to 17 U.S.C. §§ 502 and 505.

**COUNT II**
**Contributory Copyright Infringement**
**(Against Enzu, Dash Networks, DigitalOcean, and HostGator)**

87.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

88.     Defendants Enzu, Dash Networks, DigitalOcean, and HostGator (the "Infrastructure Defendants") have actual knowledge of the infringing activity occurring through their hosting and infrastructure services. The Infrastructure Defendants have received notices of infringement from Plaintiffs and their agents identifying the infringing content, the IP addresses hosting that content, and the legal basis for Plaintiffs' claims.

89.     Despite actual knowledge of the infringing activity, the Infrastructure Defendants have materially contributed to the infringement by continuing to provide the hosting, server, and content delivery services that are essential to the operation of the Infringing IPTV Services. The Infrastructure Defendants have the ability to terminate or disable access to the Infringing IPTV Services but have failed to take reasonable steps to do so. By continuing to provide essential infrastructure services after receiving actual notice of infringement, the Infrastructure Defendants have enabled and facilitated the ongoing infringement.

90.     As a direct and proximate result of these Defendants' contributory infringement, Plaintiffs have suffered and continue to suffer substantial damages and irreparable harm.

**COUNT III**
**Federal Trademark Infringement (15 U.S.C. § 1114)**
**(Against All Defendants)**

91.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

92.     Plaintiffs are the owners of valid and enforceable federal trademark registrations for the marks identified above and additional marks.

93.     Defendants, without authorization from Plaintiffs, have used Plaintiffs' registered trademarks in connection with the advertising, promotion, sale, and delivery of the Infringing IPTV Services in a manner likely to cause confusion, mistake, or deception as to the source, origin, sponsorship, affiliation, or approval of the Infringing IPTV Services, in violation of 15 U.S.C. § 1114. Specifically, Defendants display Plaintiffs' marks in their channel listings, use Plaintiffs' marks in promotional materials to attract subscribers, and create the false impression that the Infringing IPTV Services are affiliated with or authorized by Plaintiffs.

94.     Defendants' trademark infringement is willful and deliberate.

95.     As a direct and proximate result of Defendants' trademark infringement, Plaintiffs have suffered and continue to suffer damages, including loss of goodwill and reputation.

96.     Plaintiffs are entitled to injunctive relief, Defendants' profits, Plaintiffs' damages, enhanced damages for willful infringement, costs, and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1116 and 1117.

## COUNT IV
### Federal Unfair Competition and False Designation of Origin (15 U.S.C. § 1125(a))
### (Against All Defendants)

97.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

98.     Defendants' use of Plaintiffs' trademarks in connection with the Infringing IPTV Services constitutes false designation of origin and false or misleading representation of fact in violation of 15 U.S.C. § 1125(a).

99.     Defendants' conduct is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Defendants with Plaintiffs, or as to the origin, sponsorship, or approval of Defendants' services by Plaintiffs.

100.    As a direct and proximate result of Defendants' unfair competition, Plaintiffs have suffered and continue to suffer damages.

## COUNT V
### Trademark Dilution (15 U.S.C. § 1125(c))
### (Against All Defendants)

101.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

102.    Plaintiffs' marks — including UNIVISION, VIX, TUDN, and the associated logos and trade dress — are famous within the meaning of 15 U.S.C. § 1125(c). ViX is the largest dedicated Spanish-language streaming platform in the world, with over 50 million monthly active

users and more than 7 million paid subscribers, and TUDN is the #1 Spanish-language sports network in the United States. Plaintiffs' marks are the subject of extensive advertising and promotion throughout the United States (including multimillion-dollar annual advertising expenditures), are widely recognized by consumers nationwide as identifying Plaintiffs' premium Spanish-language entertainment and sports programming, and have achieved a high degree of inherent and acquired distinctiveness. Plaintiffs' marks are registered on the Principal Register of the United States Patent and Trademark Office, which constitutes prima facie evidence of their validity and distinctiveness.

103.    Defendants' use of Plaintiffs' famous marks in connection with the Infringing IPTV Services is likely to cause dilution by blurring because Defendants' unauthorized association of Plaintiffs' marks with pirated, low-quality streaming services impairs the distinctiveness of Plaintiffs' marks by creating an association between the famous marks and inferior, unlicensed content. Defendants' use is also likely to cause dilution by tarnishment because Defendants' association of Plaintiffs' marks with illegal piracy operations harms the reputation of Plaintiffs' marks by linking them to unlawful conduct and substandard services that Plaintiffs do not control or endorse.

104.    Defendants' diluting activities are willful, entitling Plaintiffs to all remedies available under 15 U.S.C. § 1125(c).

## COUNT VI
### Violation of the Digital Millennium Copyright Act, 17 U.S.C. § 1201)
### (Against All Defendants)

105.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

40

106.    Plaintiffs employ technological measures that effectively control access to their copyrighted works. These measures include, but are not limited to: (a) encryption of broadcast signals; (b) digital rights management (DRM) technologies that restrict unauthorized copying and redistribution; (c) geo-blocking technologies that limit access to authorized geographic territories; (d) subscriber authentication systems that verify authorized users; and (e) conditional access systems that control which users may access which content.

107.    On information and belief, Defendants have circumvented Plaintiffs' technological protection measures by: (a) capturing Plaintiffs' encrypted broadcast signals; (b) decrypting or otherwise bypassing Plaintiffs' encryption and DRM protections; (c) bypassing or defeating Plaintiffs' geo-blocking technologies to make content available outside authorized territories; (d) circumventing Plaintiffs' subscriber authentication systems to provide unauthorized access to paid content; and (e) stripping or bypassing conditional access controls to deliver content to unauthorized recipients.

108.    Defendants have circumvented Plaintiffs' technological measures without authorization from Plaintiffs. Defendants' circumvention is willful and undertaken for commercial gain: Defendants charge subscribers for access to content that Defendants have obtained by circumventing Plaintiffs' technological protections.

109.    Defendants have as a result intentionally circumvented technological measures that effectively control access to protected works.

110.    Plaintiffs have suffered irreparable harm resulting from the conduct of Defendants described above for which there is no adequate remedy at law and which will continue unless Defendants are enjoined from circumventing Plaintiffs' technological measures. Plaintiffs are entitled to injunctive relief pursuant to 17 U.S.C. § 1203(b)(1).

111.  Plaintiffs are also entitled to an award of statutory damages of $2,500 per act of circumvention pursuant to 17 U.S.C. § 1203(c)(3), or in the alternative, actual damages, including profits by Defendants, pursuant to 17 U.S.C. § 1203(c)(2).

112.  Plaintiffs are also entitled to an award of costs and reasonable attorneys' fees in this action pursuant to 17 U.S.C. § 1203(b)(4) and (5).

## COUNT VII
### Trademark Infringement Under the Common Law

113.  Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

114.  Defendants' use of Plaintiffs' trademarks in connection with the Infringing IPTV Services constitutes trademark infringement under the common law.

115.  Defendants' conduct is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Defendants with Plaintiffs, or as to the origin, sponsorship, or approval of Defendants' services by Plaintiffs.

116.  As a direct and proximate result of Defendants' unfair competition, Plaintiffs have suffered and continue to suffer damages.

## COUNT VIII
### Unfair Competition Under the Common Law

117.  Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

118.  Defendants' use of Plaintiffs' trademarks in connection with the Infringing IPTV Services constitutes unfair competition under the common law.

119.   Defendants' conduct is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Defendants with Plaintiffs, or as to the origin, sponsorship, or approval of Defendants' services by Plaintiffs.

120.   As a direct and proximate result of Defendants' unfair competition, Plaintiffs have suffered and continue to suffer damages.

**COUNT IX**
**Tortious Interference with Contractual Relations**
**(Against All Defendants)**

121.   Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

122.   Plaintiff TelevisaUnivision, through the Licensee NIP, is a party to a valid and enforceable contract with FIFA — FIFA Media Rights Agreement — under which TU holds exclusive media rights to transmit the FIFA World Cup 2026 (the "Competition") and FIFA World Cup 2030 in Mexico. The FIFA Media Rights Agreement represents a contract of extraordinary value, reflecting hundreds of millions of dollars in consideration already paid by TU to FIFA.

123.   The FIFA Media Rights Agreement imposes affirmative contractual obligations on TU, including: (a) a prohibition on exercising or permitting the exercise of the Media Rights outside of the Territories; (b) a requirement that digital rights management technologies be employed to FIFA's satisfaction to prevent unauthorized distributions; (c) a requirement that all commercially available means, including geo-blocking, be employed to ensure transmissions are not receivable outside the Territories; and (d) a requirement that all retransmissions be securely encrypted to prevent reception outside the Territories. The United States is not among TU's licensed Territories; the U.S. World Cup media rights have been separately granted by FIFA to third parties.

43

124. Defendants had actual knowledge of the FIFA Media Rights Agreement, or at minimum, knowledge of facts and circumstances from which the existence of such a contract could reasonably be inferred. Defendants are aware that TU operates premium content services and holds exclusive broadcast rights, as evidenced by: (a) the Infringing IPTV Services specifically target TU's premium ViX content, Liga MX soccer broadcasts, and TUDN live programming; (b) investigative communications confirm that Thunder TV and Sunset TV operators have explicitly stated via WhatsApp that their services carry restricted signals including "Liga MX" and "ViX premium"; (c) the Infringing IPTV Services are actively advertising that they will transmit World Cup programming to their subscribers despite lacking any authorization to do so; and (d) Defendants have received actual notice of Plaintiffs' rights through DMCA takedown notices and cease-and-desist communications.

125. Defendants have intentionally and improperly interfered with the FIFA Media Rights Agreement. Upon information and belief, Defendants intend to capture TU's licensed broadcast signal from Mexico during the World Cup and retransmit it to subscribers in the United States, thereby making TU's FIFA content available in a territory where another licensee holds exclusive rights. This conduct will place TU in material breach of its obligations under the FIFA Media Rights Agreement, including TU's obligation to prevent its content from being accessible outside the licensed territories. Defendants' interference is intentional: Defendants are fully aware that TU holds exclusive rights to broadcast the World Cup in Mexico and that those rights do not extend to the United States, yet Defendants have publicly announced their intention to pirate and redistribute TU's World Cup broadcasts to U.S. subscribers.

126. Defendants' interference is improper because it is accomplished through independently tortious conduct — including willful copyright infringement, trademark

44

infringement, unfair competition, and circumvention of technological protection measures — and because Defendants have no legitimate business justification for their conduct. Defendants' sole purpose in retransmitting TU's signal to U.S.-based subscribers is to profit from the unauthorized distribution of copyrighted content. Defendants operate sophisticated, commercially motivated piracy enterprises that charge subscribers for access to stolen content, process payments through identifiable financial accounts, and deliver their unauthorized streams through U.S.-based server infrastructure. Under these circumstances, Defendants' interference with the FIFA Media Rights Agreement is improper as a matter of law.

127.    Defendants' tortious interference is ongoing and, absent judicial intervention, will intensify upon the commencement of the FIFA World Cup 26 on June 11, 2026. Although Defendants have not yet retransmitted TU's World Cup broadcasts, their announced intention to do so — combined with their demonstrated capability to capture and redistribute TU's live sports content — establishes that interference is not merely threatened but imminent and certain. Under Florida law, a cause of action for tortious interference accrues when interference is substantially certain to occur. Because Defendants have publicly committed to pirating and redistributing World Cup content and have the operational infrastructure to do so, Plaintiffs' tortious interference claim is ripe for adjudication.

128.    As a direct and proximate result of Defendants' tortious interference, Plaintiffs have suffered and continue to suffer damages, including: (a) exposure to termination of the FIFA Media Rights Agreement, which permits FIFA to terminate the Agreement with immediate effect if the Licensee fails to perform any material obligation and does not cure within a narrow window during a Competition; (b) upon any such termination, the automatic reversion of all rights to FIFA, forfeiture of all payments already made (totaling hundreds of millions of dollars), and continued

45

liability for all unpaid installments; (c) the permanent loss of the World Cup media rights; (d) the costs of mandatory remedial action required by the FIFA Media Rights Agreement; and (e) irreparable harm to Plaintiffs' business reputation and relationships with FIFA and other licensors.

129.    The FIFA World Cup 26 is scheduled to commence on June 11, 2026. The imminent commencement of the World Cup makes the threat of interference not speculative but certain — absent judicial intervention, the Infringing IPTV Services will retransmit TU's World Cup signal to U.S.-based subscribers within a matter of days, placing TU in immediate breach of its obligations under the FIFA Media Rights Agreement and exposing TU to catastrophic contractual consequences.

130.    Plaintiffs are entitled to compensatory damages, consequential damages, and such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

131.    Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand a trial by jury on all issues triable at law.

## PRAYER FOR RELIEF

132.    WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and grant the following relief:

A. Entry of temporary, preliminary, and permanent injunctions pursuant to 15 U.S.C. § 1116, 17 U.S.C. § 502(a), and Federal Rule of Civil Procedure 65, enjoining Defendants, their agents, representatives, servants, employees, and all those acting in concert or participation therewith, including without limitation Internet Service Providers (ISPs); web hosts; Internet infrastructure support entities; content delivery network providers; reverse proxy services; cloud computing and bare-metal server

46

providers; encoding, transcoding, and signal-capture service providers; middleware and IPTV panel management platforms (including but not limited to Stalker/Ministra Pro and comparable systems); sideloading facilitation applications and their distribution platforms; website owners and operators; social media owners and operators; telecommunications app owners or operators such as WhatsApp, App stores such as Google Play; Internet search engines, domain-name registrars, and domain name registries and/or their administrators; payment processors, banks, money transmitters, and financial institutions (including but not limited to PayPal, Stripe, Mercado Pago, and all cryptocurrency exchanges); and advertising networks and programmatic ad exchanges (collectively, "Third-Party Service Providers") from:

(a) advertising, promoting, performing, copying, broadcasting, performing, and/or distributing any of Plaintiffs' copyrighted works and/or content that currently exists or which exists in the future, including without limitation all broadcasts, programs, and content relating to the 2026 FIFA World Cup and any subsequent FIFA events, and any copyrighted works or broadcasts that Plaintiffs may in the future produce, license, or acquire rights to transmit;

(b) infringing, counterfeiting, or diluting Plaintiffs' trademarks, or any similar mark, in connection with the advertisement, promotion, or distribution of Plaintiffs' copyrighted content; using any logo, trade name, or trademark that may be calculated to falsely advertise Defendants' pirated content; representing themselves or their services as being sponsored by, authorized by, endorsed by, or associated with Plaintiffs; or engaging in any act likely to cause members of

the public to believe Defendants' pirated content or services are endorsed by, approved by, or associated with Plaintiffs;

(c) operating, hosting, providing encoding or transcoding services for, providing content delivery network or reverse proxy services to, providing middleware or subscriber management platforms for, or otherwise providing technical services in support of the Infringing IPTV Services (as identified in Schedule A attached hereto and as may be supplemented from time to time), or any comparable system, device, data transmission service, application, or platform through which Defendants or those acting in concert with them provide unauthorized access to Plaintiffs' copyrighted programming, including by means of any internet-based transmission, peer-to-peer or BitTorrent protocol, file sharing, content delivery, or sideloading technology;

(d) processing, facilitating, or transmitting any payment, subscription fee, reseller credit, or other monetary transaction in connection with the Infringing IPTV Services, and from maintaining or using any bank account, digital wallet, payment processing service, cryptocurrency wallet, or money transmitter for such purposes;

(e) placing, serving, brokering, or facilitating any advertisement on or in connection with the Infringing IPTV Services or any website, application, or social media account promoting them;

(f) from engaging in search engine optimization strategies using colorable imitations of the Plaintiffs' name or trademarks; and from otherwise unfairly competing with Plaintiffs.

48

B. Entry of temporary, preliminary, and permanent injunctions pursuant to 28 U.S.C. § 1651(a), the All Writs Act, enjoining Defendants and all third parties from creating, maintaining, operating, joining, supporting, or participating in, including providing financial, technical or other support to, any Internet-based or other platforms, websites, apps, domains, marketplaces, or other platform of any kind used to copy, distribute, perform, advertise, or promote pirated content that infringes Plaintiffs' copyrights or trademarks or that interferes in any way with Plaintiffs' exclusive rights and licenses, including without limitation the right to broadcast the 2026 FIFA World Cup. The Infringing IPTV Services subject to this Order are identified in Schedule A attached hereto, which Plaintiffs may supplement by filing a verified declaration identifying additional infringing services, IP addresses, domains, applications, or platforms discovered after entry of this Order. Such supplementation shall take effect upon filing and service of the verified declaration on affected parties, subject to any party's right to move to modify the Order within fourteen (14) days of service;

C. Entry of an Order pursuant to 28 U.S.C. § 1651(a), the All Writs Act, that, upon Plaintiffs' request, Third-Party Service Providers and others in privity with Defendants or with notice of the injunction: (1) cease facilitating access to and/or providing support of any kind to any Internet-based or other platforms, websites, apps, domains, marketplaces, or other platform of any kind used to copy, distribute, perform, advertise, or promote content that infringes Plaintiffs' copyrights or trademarks; (2) remove/unmask any privacy shield or other mechanisms that shield the identity of the owner or operator of any Internet-based or other platforms, websites, apps, domains, marketplaces, or other platform of any kind used to copy, distribute, perform, advertise,

49

or promote content that infringes Plaintiffs' copyrights or trademarks and disclose to Plaintiffs the true identities and contact information of those registrants/website owners and operators; (3) otherwise cooperate with Plaintiffs to prevent the further unauthorized display and distribution of Plaintiffs' copyrighted content; and (4) disable all IP addresses used to transmit any infringing content on the Infringing IPTV Services, which IP addresses may be reassigned to other customers after they have been disabled and are no longer being used in connection with any of the enjoined activities;

D. Entry of an Order canceling or deleting, or, at Plaintiffs' election, transferring the subject domain names and any other domain names used by Defendants to engage in their infringing activities at issue to Plaintiffs' control so that they may no longer be used for illegal purposes;

E. An order directing Defendants to disable and take down all Infringing IPTV Services and to surrender or destroy all infringing materials in their possession, custody, or control;

F. An accounting of all gains, profits, and advantages derived by Defendants from their infringing activities;

G. Actual damages suffered by Plaintiffs as a result of Defendants' infringement, or, at Plaintiffs' election, statutory damages as provided by 17 U.S.C. § 504(c);

H. Defendants' profits attributable to their infringement pursuant to 17 U.S.C. § 504(b) and 15 U.S.C. § 1117(a);

I. Enhanced damages and/or treble damages for willful infringement pursuant to 15 U.S.C. § 1117(b);

J. Plaintiffs' reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505 and 15 U.S.C. § 1117(a);

K. Pre-judgment and post-judgment interest; and

L. For purposes of this Order, "Infringing IPTV Services" includes all services identified in Schedule A and any comparable system, meaning any device, application, data transmission service, or platform — whether currently in existence or developed in the future — through which Defendants or those acting in concert or participation with them provide users with unauthorized access to Plaintiffs' copyrighted programming or FIFA World Cup content, including by means of any internet-based transmission, peer-to-peer protocol, content delivery technology, or sideloading mechanism, regardless of the branding, domain name, or technical configuration used;

M. Entry of an Order that Third-Party Service Providers receiving notice of this Order shall: (1) restrain and hold all funds in accounts associated with Defendants or the Infringing IPTV Services; (2) provide Plaintiffs' counsel with an accounting of all restrained funds and identification of the financial accounts; (3) provide the true identities and complete contact information of the account holders; and (4) cease processing any transactions in connection with the Infringing IPTV Services;

N. Entry of an Order granting Plaintiffs leave to conduct limited expedited discovery, including § 512(h) subpoenas and Rule 45 subpoenas to hosting, CDN, payment, domain, and other infrastructure providers, upon filing a verified declaration identifying newly-discovered infringing activity, without requiring a separate motion;

O. Entry of an Order that this Court shall retain jurisdiction for a period of not less than two (2) years following entry of any permanent injunction for the purpose of

enforcement, including without limitation: (i) supplementation of the attached schedules to add newly-identified infringing services, domains, IP addresses, and infrastructure providers; (ii) issuance of additional subpoenas to hosting, CDN, payment, and domain providers upon a verified declaration by Plaintiffs; and (iii) determinations of damages and attorneys' fees recoverable in connection with enforcement proceedings;

P.  Such other and further relief as this Court deems just and proper.

Dated:  June 4, 2026

By: _Aaron S. Weiss_

Aaron S. Weiss (FBN 48813)
Email: aweiss@carltonfields.com
Carlton Fields, P.A.
700 NW 1st Avenue, Suite 1200
Miami, Florida 33136
Telephone: (305) 530-0050

Ross Q. Panko (Pro Hac to be Filed)
Email: laurel.lamontagne@afslaw.com
Laurel LaMontagne (Pro Hac to be Filed)
Emal: laurel.lamontagne@afslaw.com
Arentfox Schiff LLP
1717 K Street, NW
Washington, DC 20006
Telephone: (202) 857-6000

*Attorneys for Plaintiff*

<u>**SCHEDULE A**</u>

**INFRINGING IPTV SERVICES, DOMAINS, AND IP ADDRESSES**
<u>**I. INFRINGING IPTV SERVICES**</u>
1. Thunder TV (also known as "Thunder IPTV")
2. Sunset TV
3. Pop TV
4. Kaelus TV (also known as "Kaelus TV Plus" or "KTV Plus" or "NIBI TV")
5. Tele Latino (also known as "Tele Latino MAX")

<u>**II. INFRINGING DOMAINS**</u>
**Thunder TV Domains:**
thundertv.shop
thundertvdealer.com
mxthundertv.com
thundertv.mx
reliable.rayote.com
rayote.com
**Sunset TV Domains:**
sunset-tv.com
sunset-tv.site
**Pop TV Domains:**
boral.app
pop-live.app
access.pop-app.live
pop-app.live
**Kaelus TV Domains:**
kaelustv.plus
ktv.mx
**Tele Latino Domains:**
telelatinotv.com.mx
telelatinopro.com
telelatino.net

<u>**III. INFRINGING IP ADDRESSES**</u>
**Thunder TV IP Addresses (Hosted by Enzu LLC / Dash Networks Inc.):**
199.188.74.13 (Live TV streaming server)
5.180.41.47 (VOD streaming server)
172.67.148.36 (Subtitles/Metadata server — Cloudflare)
**Thunder TV IP Addresses (Hosted by HostGator.com LLC):**
192.185.131.134 (mxthundertv.com)
192.169.250.114 (thundertv.mx)
**Pop TV IP Addresses (Hosted by DigitalOcean, LLC):**
138.197.235.3 (boral.app — C2 primary server, Santa Clara, CA)
159.65.188.24 (pop-live.app — C2 backup server, Clifton, NJ)
134.209.211.89 (access.pop-app.live — main IPTV gateway, North Bergen, NJ)

142.93.3.196 (fallback node, North Bergen, NJ)
157.230.82.61 (fallback node, North Bergen, NJ)
138.197.224.59 (pop-app.live — fallback node, North Bergen, NJ)
**Tele Latino IP Addresses (Hosted by DigitalOcean, LLC):**
165.227.192.153 (telelatino.net)

## IV. SIDELOADING DOWNLOAD CODES

The following download codes are used to install the Infringing IPTV Services via the AFTVNews
Downloader application on Fire TV and similar Android-based streaming devices:
Kaelus TV: 9361960
Thunder TV: 480310
Sunset TV: 18479
Tele Latino: 5317131

**VERIFICATION**

I, Deborah Flores Garza, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that:

1.      I am employed by TelevisaUnivision, Inc. as Senior Vice President, Global Intellectual Property.

2,      I am authorized to make this verification on behalf of Plaintiffs TelevisaUnivision, Inc. and Televisa, S. de R.L. de C.V.

3.      I have read the foregoing Complaint and am familiar with the facts stated therein.

4.      The facts stated in the Complaint are true and correct to the best of my knowledge, information, and belief.


Executed on June 3, 2026.




_____
Deborah Flores Garza



55